UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:17CR00474 SNLJ/NCC |
| | ) | |
| HAROLD PERKINS, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM, AND REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

This matter was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b).

Defendant Harold Perkins filed Defendant's Motion to Suppress Evidence and Statements on February 14, 2018 (Doc. No. 32). The government filed a Response to Defendant's Motion To Suppress Evidence and Statements on February 23, 2018 (Doc. No. 37). The court held a hearing on defendant Perkins' Motion on July 3, 2018.[1] The government presented the testimony of two law enforcement officers with the St. Louis Metropolitan Police Department. At the conclusion of the hearing, the undersigned ordered that post-hearing briefs be filed. On August 31, 2018, defendant filed a *pro se* motion, styled as "Amend To Motion To Suppress Evidence and Statements." (Doc. No. 61). Defense counsel filed Defendant's Post-Evidentiary Hearing Memorandum in Support Of Motions to Suppress Evidence and Statements and Request for Leave To Supplement. (Doc. No. 64). An additional evidentiary hearing was

---

[1] On February 28, 2018 the undersigned held a hearing on defendant's motion for appointment of new counsel. Defendant's motion was granted. CJA counsel requested additional time to file pretrial motions and the court granted defendant's motion to continue.

held on October 18, 2018.  The court ordered that copies of the evidentiary hearing transcripts be prepared to assist the court in making findings of fact and conclusions of law.  The final transcript was filed on October 29, 2018.  On December 10, 2018, defendant Perkins filed a *pro se* Motion to Dismiss For Violation of Constitution Right Of Due Process Of Law (Doc. No. 70). Based on the evidence and testimony adduced, as well as a review of the transcripts of the hearings in this matter; and after having had an opportunity to evaluate the credibility of the witnesses and observe their behavior, the undersigned makes the following findings of fact and conclusions of law.

## FACTS[2]

In the early morning hours of Wednesday, July 26, 2017, St. Louis Metropolitan Police Officer Robert Cooper, a 2016 graduate of the police academy, was on routine patrol in the Fourth District driving in his marked police Chevy Tahoe.  Officer Cooper drove northbound on North Grand Boulevard approaching Montgomery Street in the far left lane.  (*See* Gov't Exs. 1, 3).  At approximately 12:15 a.m., Officer Cooper saw a 2004 black four-door Saturn Ion violate a city traffic ordinance by turning northbound from Montgomery Street onto North Grand and bypassing the closest turn lane.  The car traveled into the farthest lane of North Grand approximately 100 yards in front of him.  Officer Cooper followed the Saturn northbound at a distance for approximately ten blocks.  He believed that the car was traveling at a high rate of speed, exceeding the 35 mile per hour speed limit, as he saw it passing other vehicles.  Officer Cooper eventually closed the distance, pursuing the car about three quarters of a mile until the Saturn stopped at a red light at the intersection of North Grand and Natural Bridge.  Officer

---

[2] Officer Cooper testified at both evidentiary hearings before the undersigned.  Officer Cooper's testimony at both hearings is included here.

Cooper could not see inside the car, which had dark tinted windows.  He could see a defective brake light on the car's right rear side and he noted the Missouri license plate number.

Officer Cooper knew that an inoperable brake light on a moving vehicle is a safety concern and a violation of St. Louis City Ordinance 17.16.150(C).  The improper turn that the car made from Montgomery Street onto North Grand violated St. Louis City Ordinance 17.16.120.  Once the light turned green, Officer Cooper ran an inquiry on the Saturn's license plate.  The vehicle was not reported stolen.  Officer Cooper decided to conduct a traffic stop.  Officer Cooper also requested assistance via his police radio.  Officer Ishmael Tyson would later respond to the scene.

Officer Cooper followed the Saturn for another three to four blocks.  (*See* Gov't Ex. 2).  He activated his emergency lights and siren.  The Saturn turned immediately right onto the 3500 block of Kossuth near a street light and the car moved to the side of the road.  Officer Cooper could not see inside the vehicle even with his vehicle's headlights and spotlight directed at the car.  Officer Cooper did not know how many individuals were inside the vehicle when he exited his patrol car and made his approach.  He was in uniform.  He yelled for the driver to roll down his windows three times.  Approximately 30 seconds passed between the time he activated his police vehicle lights and the driver's action of rolling down the driver's side car window.

The driver, who was later identified as defendant Harold Perkins, opened the driver's side door a bit and yelled back that he could not roll down all the windows.  Perkins made no furtive movements, nor did he make any moves that Officer Copper considered to be dangerous.  The other car windows remained closed.  The driver's window was open at least halfway, and the door was open enough for Officer Cooper to see defendant's face between the door frame and the door.  Defendant yelled to Officer Cooper that he was the only person in the car.

3

Officer Cooper told Perkins to put his hands out the window.  Defendant opened the driver's side door more and stuck his feet out and put them on the ground.  Then, he showed his hands.  Defendant held no weapons.  Officer Cooper did not consider defendant's actions to be in compliance with his command to show his hands.  Officer Cooper was concerned that he was "losing control" of the traffic stop because defendant did not follow his instructions.  In Officer Cooper's nine months of training and experience, a driver's actions of opening a car door during a stop presented a greater potential threat than when a driver opens the window and follows instructions.  The act of opening of a car door can signal to him the worst-case scenario that the driver intends to start shooting.

As a result of Perkins' comment, Officer Cooper instructed defendant to show his hands by placing them outside the car window.  Officer Cooper walked toward the driver's side door.  Defendant was wearing a small leather satchel with a zipper draped over his left shoulder.  Based on his training and experience, Officer Cooper was concerned that the unzipped satchel could contain a firearm.  Officer Cooper has had ongoing discussions with other police officers about their collective concern that weapons are inside the leather satchels that are worn by people on the street.

Officer Cooper's security assist police officer had yet to arrive when he asked defendant Perkins to step out of the Saturn for safety.  Defendant made no furtive movements doing this encounter, and he was placed in handcuffs immediately and near the Saturn.  Officer Cooper described defendant as African American.  Defendant's age was roughly in his "thirties," he was intelligent, and he did not appear to be under the influence of any alcohol or drugs on July 26, 2017.  Office Cooper, who is Caucasian, had permission to look inside the satchel within one minute of the stop.  Defendant was not free to leave.

Officer Cooper asked defendant Perkins if he had a gun in the satchel.  Perkins responded, "No, you can check it."  Officer Cooper looked in the satchel with the illumination of his police flashlight.  He saw two .40 caliber cartridges.  Officer Cooper thought that if defendant had bullets, he likely also had a gun.

Officer Cooper asked, as a safety measure, why defendant had bullets in his bag.  Officer Cooper testified that defendant Perkins said, "I keep them in there to remind me that I am not allowed to have guns."  Because that response did not "make sense" to him, Officer Cooper next asked defendant Perkins if he was a felon.  Defendant responded, "Yes, I'm on parole for dope."  Officer Cooper thought that there was a weapon in the Saturn and he believed he had authority at that time to arrest defendant for being a felon in possession of ammunition.

Officer Tyson also testified at the hearing.  He explained that his general assignment was working as a one-man assigned patrol unit, similar to Officer Cooper's assignment.  He responded to the radio call that he was the security assist officer who watched defendant Perkins while Officer Cooper completed the traffic stop.

When he arrived, Officer Tyson parked his patrol vehicle behind Officer Cooper's patrol vehicle and walked toward the two men.  Defendant was handcuffed.  The three men were the only persons present at the scene of the traffic stop, although people walked by.  Officer Tyson heard them talking as he approached, and he heard defendant say, "Yes, you can, but what are you looking for?"  He then stood with defendant Perkins while Officer Cooper walked to his police vehicle to conduct a computer records check.  About five minutes after the initial traffic stop, Officer Cooper's computer check via his mobile REGIS system showed no active warrants or wanted status for defendant.  It did show that defendant was on parole and that he was a

previously convicted felon.  The REGIS report also showed that defendant had multiple prior arrests and convictions, including prior gun convictions.

Officer Cooper then asked defendant's permission to search the car because he suspected that weapons were present.  Officer Cooper testified similarly to Officer Tyson that Defendant said, "That's fine.  Can I ask what you are looking for?"  Officer Cooper told him that he was looking for weapons because of the bullets found.  Defendant did not object to the car search as the vehicle sat curbed on Kossuth Street.  No threats or promises were made to defendant. Officer Cooper did not draw his gun at any time.  Officer Cooper peered into the front seat and looked into the back seat where he saw a spent .40-caliber shell casing on the floorboard.  The spent casing was a similar caliber to the two bullets he saw in the leather satchel that defendant was wearing.  He found items including a loaded .40 caliber Smith & Wesson handgun underneath the driver's seat, a .40-caliber Glock magazine loaded with eight live rounds, and a Glock handgun with a 30-round extended magazine behind the driver's seat.  Officer Cooper found more ammunition in the glove box and another firearm.  He did not check whether the Saturn had electric windows or manual roll-down windows.

After Officer Cooper completed the vehicle search, he removed the firearms and ammunition.  Defendant Perkins then asked Officer Cooper, "What's going on?"  After the weapons were seized and Officer Cooper told defendant what he found, defendant made a spontaneous statement at the scene that his friend left the firearms in the car.  Defendant Perkins was arrested for unlawful possession of a firearm and possession of a defaced firearm.  Officer Cooper also issued citations for the vehicle and traffic violations.

Both Officer Tyson and Officer Cooper recalled that Officer Cooper read *Miranda* warnings to defendant after the firearms were seized.[3]

An officer contacted Defendant's mother who responded to the scene to drive the vehicle away.  Officer Tyson saw the driver's side window go up after defendant's mother drove the car away.

## DISCUSSION

## I. SUPPRESSION OF EVIDENCE

### A. The Initial Traffic Stop Of The Saturn Ion Was Based On Probable Cause And It Did Not Violate The Equal Protection Clause.

"A traffic stop is considered a seizure for Fourth Amendment purposes."  *United States v. Guevara*, 731 F.3d 824, 827 (8th Cir. 2013).  The Fourth Amendment provides:

> "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

In order to justify the seizure, the stop must be "supported by either probable cause or an articulable and reasonable suspicion that a traffic violation has occurred," and the police must "objectively ha[ve] a reasonable basis for believing that the driver has breached a traffic law." *United States v. Washington*, 455 F.3d 824, 826 (8th Cir. 2006).   Traffic stops conducted after traffic violations are reasonable.  "A traffic violation—however minor—creates probable cause [for the police] to stop the driver of a vehicle."  *United States v. Wright*, 512 F.3d 466, 471 (8th Cir. 2008) (quoting *United States v. Bloomfield*, 40 F.3d 910, 915 (8th Cir. 1994) (en banc));

---

[3] At the first hearing in this matter, Officer Cooper did not recall reading *Miranda* warnings to defendant Perkins.

*United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004). The government bears the burden of establishing that probable cause existed under the totality of the circumstances. *United States v. Andrews*, 454 F.3d 919, 922 (8th Cir. 2006).

In his post-hearing response, defendant argues that a reasonable person would not believe that he was free to leave upon being handcuffed—particularly when the person handcuffed is African American and the officer is Caucasian. But the parties do not dispute that defendant was not free to leave while handcuffed, although the government contends that the detention was temporary and was not an arrest. Still, to the extent that defendant more broadly argues that the real motive for the traffic stop was defendant's race or was the sole reason Officer Cooper handcuffed him, such an argument is not supported by the factual record and there is no other evidence of pretext to support an equal protection claim. *See United States v. Frazier*, 394 F.3d 612, 616-617 (8th Cir. 2005).[4] "'[T]he Constitution prohibits selective enforcement of the law based on considerations such as race ... [and] the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause ....' " *Johnson v. Crooks*, 326 F.3d 995, 999 (8th Cir. 2003) (quoting *Whren v. United States*, 517 U.S. 806, 813, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996)). Although Officer Cooper was not a veteran police officer at the time of this encounter, he was a patrol officer working a routine patrol when he saw three traffic violations by a driver who was shielded behind tinted glass. The Saturn appeared to be speeding; the brake light was not working, and the vehicle made an illegal turn onto North Grand. *United States v. Coney*, 456 F.3d 850 (8th Cir. 2006) (affirming the district court's ruling that defendant traffic stop was a result of law violation and rejecting argument that it was based on racial motivation where the evidence did not support that argument). *See also United States*

---

[4] Alternatively, defendant Perkins' suggests that Officer Cooper's quick decision to handcuff him was due to the officer's lack of experience. (Def. Response, Doc. #64, p. 5).

8

*v. Brown*, 345 F.3d 574, 578–80 (8th Cir. 2003) (reasoning that a police officer who observed a traffic violation has probable cause to stop the vehicle and its driver).  Once he conducted the vehicle stop, Officer Cooper was also authorized to check for a driver's license and the vehicle's registration; conduct computer searches relating to criminal history, and detain defendant for as long as reasonably necessary to conduct these activities and to issue a warning or citation. *Brown*, 345 F.3d at 574.  *United States v. Quintana*, 623 F.3d 1237, 1239 (8th Cir. 2010) (quoting *United States v. Jones*, 269 F.3d 919, 924–25 (8th Cir. 2001).  The U.S. Supreme Court has noted that "[a] seizure for a traffic violation justifies a police investigation of that violation." *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015) (collecting cases: "[A] relatively brief encounter," a routine traffic stop is "more analogous to a so-called '*Terry* stop' ... than to a formal arrest."  *Knowles v. Iowa*, 525 U.S. 113, 117, 119 S.Ct. 484, 142 L.Ed.2d 492 (1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984), in turn citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)).  *See also Arizona v. Johnson*, 555 U.S. 323, 330, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009)).  "[S]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis."  *United States v. Gunnell*, 775 F.3d 1079, 1083 (8th Cir. 2015) (quoting *Whren v. United States*, 517 U.S. 806, 813 (1996)) (alteration in original); *see also United States v. Frasher*, 632 F.3d 450, 453-54 (8th Cir. 2011).  Thus, Officer Cooper's decision to conduct the traffic stop appears to be the ordinary case where an ordinary Fourth Amendment analysis applies.  The stop was reasonable under the circumstances, it was of reasonable length, and it was based on probable cause inasmuch as defendant committed three traffic violations in the officer's presence.

Defendant next argues that his constitutional rights were violated because Officer Cooper unlawfully detained him without reasonable suspicion of criminal activity. These related arguments are addressed below in turn.

### B. A Police Officer Can Lawfully Order A Driver Out Of A Vehicle Under These Circumstances.

Once Officer Cooper made the lawful traffic stop, and defendant did not follow the lawful directives to lower the windows, Officer Cooper was justified in directing defendant to get out of his vehicle to complete the traffic stop. *Maryland v. Wilson*, 519 U.S. 408, 410 (1997). Officer Cooper had reason to be concerned for his safety when he could not see inside the darkened windows to establish the number of occupants or any occupant's response to being pulled over. He thought the car had been speeding. Shortly after the stop, defendant opened the driver's side door instead of rolling or powering down the windows as Officer Cooper commanded. The driver's feet were positioned toward the street to possibly exit the vehicle. Officer Cooper was unassisted and it was dark.[5] *United States v. Sanford*, 813 F.3d 708, 713 (8th Cir. 2016) (approving similar police action in response to a distress call where suspect was ordered out of vehicle as part of *Terry* stop after driver made furtive movements near a night club known to have violent incidents).[6] In this case, Officer Cooper knew that a satchel could conceal a weapon, which presented a safety issue. All of this created a sufficient basis to ask

---

[5] There was no testimony offered about the level of crime in this neighborhood and such a factor was not weighed by the undersigned in this discussion.

[6] The undersigned is aware that the facts of many of the *Terry* stop cases cited by the parties credit police officer testimony of furtive movements or gestures by the defendant—perhaps to hide a dangerous weapon or contraband. Here, Officer Cooper's testimony suggests that defendant's foot movements were a safety concern because they were assertive, rather than furtive. Ultimately, this factual distinction does not alter the court's Fourth Amendment analysis of the officer's reasonableness in detaining defendant Perkins under the totality of the circumstances and the potential danger present.

defendant Perkins to step out of the vehicle. *See, e.g., United States v. Barahona*, 990 F.2d 412, 416 (8th Cir. 1993) ("[I]f the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions."). Any "subsequent questions represented a minimally intrusive way of addressing his reasonable suspicion; asking them did not, therefore, constitute an unreasonably prolonged detention." *Donnelly*, 475 F.3d at 953.

> ### C. There Was Reasonable Suspicion to Conduct a Terry Stop and Frisk, Handcuff Defendant, and Conduct a Protective Sweep Of the Saturn Ion.

Moreover, it is well established that a police officer may detain a person when there is reasonable suspicion that criminal activity is afoot based on the totality of the circumstances; a mere hunch will not suffice. *United States v. Pope*, 910 F.3d 413, 414 (8th Cir. 2018). *United States v. Morgan*, 729 F.3d 1086, 1089 (8th Cir. 2013) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion to conduct a frisk depends on whether the officer believes a suspect is "armed and dangerous." *Pope*, 910 F.3d at 416 (quoting *Terry*, 392 U.S. at 27). At the same time, the courts have acknowledged that a balance must be maintained. "[W]e think it remains reasonable to allow an officer to frisk someone whom the officer has lawfully stopped and whom the officer reasonably believes is armed." *Pope*, 910 F.3d at 417. The use of handcuffs on a suspect and even placing a suspect in a police vehicle during a *Terry* stop does not violate a defendant's rights if officer safety is at issue. *See id.* (reasoning in *Pope*, *supra*, that handcuffs limit rather than eliminate potential danger)*; United States v. Smith*, 645 F.3d 998, 1002 (8th Cir. 2013); *United States v. Navarrete-Baron*, 192 F.3d 786, 791 (8th Cir. 1999). Protective searches allow for an officer's use of handcuffs. *United States v. Miller*, 974 F.2d 953, 957 (8th Cir. 1992). This is reasonable because during a *Terry* stop, an officer may take any

measure that is reasonably necessary to protect personal safety and to maintain the status quo during the course of the stop. *Sanford*, 813 F.3d at 713.

However, the Eighth Circuit also cautioned in *Sanford* that the officers must use the least intrusive means of detention and investigation during a *Terry* stop to achieve its purpose. "There is no clear line between investigative stops and de facto arrests." *Id.* (citing *United States v. Guevara*, 731 F.3d 824, 831 (8th Cir. 2013)). Efforts by the police to communicate with a person on the street may become a Fourth Amendment seizure if by means of physical force or show of authority, the person's freedom of movement is restrained to the extent that, considering the totality of the circumstances, a reasonable person would have believed that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544, 554 (1980); *Terry*, 392 U.S. 1, at 19 n.16. As discussed above, defendant correctly claims that he was temporarily seized. He further insists that there was no suspicious behavior on his part that justified the expansion of the traffic stop, leading to his being handcuffed and questioning about his satchel. Defendant points to the testimony at the hearings and the evidence that the computer check conducted by Officer Cooper (prior to the stop), revealed no problem with the vehicle's status or with any individual to whom the vehicle was registered. Defendant was not known to Officer Cooper as a target of any investigation before their encounter. Defendant stopped the car promptly when Officer Cooper activated his police lights. There was no testimony about the general safety or dangers of the neighborhood and such testimony by the government would still need to be particularized as to defendant. Further, Officer Cooper could not observe any suspicious behavior inside the vehicle prior to the stop because the windows were darkly tinted.

To the extent that defendant argues that the scope of the stop exceeded *Terry* and amounted to a *de facto* arrest, such an argument has force with respect to defendant's Fifth

Amendment rights, and which is addressed below.  However, as to defendant's Fourth Amendment protections such an argument fails to consider that the investigation of the traffic violations was ongoing as Officer Cooper questioned defendant on the street after defendant failed to follow the commands to show his hands.  No information was yet collected from defendant in order to issue any traffic citations.  The possible danger the officer associated with defendant's opening the door and placing his feet on the ground was not resolved.  The government argues persuasively that defendant's body positioning at the open car door—away from the driver's wheel and toward Officer Cooper—was a valid cause for concern about officer safety.  Officer Cooper said that he felt that he was "losing control" of the traffic stop, and it was unclear in the moment whether defendant intended to stand up and exit the vehicle without prompting.

As discussed above, the undersigned finds no evidence that the officer's purpose in conducting the traffic stop was motivated because defendant is African American or that his level of experience led to unconstitutional police action.  The officer did not draw his weapon.  It was reasonable under the totality of the circumstances for Officer Cooper to confirm that defendant did not have the means or intention to confront him with a weapon in the process of conducting the traffic stop.  Thereafter, Officer Cooper's questions about what was in the satchel were reasonable in order to rule out danger.  It was also reasonable that the unusual answer given by defendant about the ammunition observed in the satchel worked to heightened Officer Cooper's suspicion.  This point should be denied.

### D. Defendant Gave Consent to Search His Satchel and the Saturn Ion.

The government argues that defendant's consent to the searches was voluntary. Defendant insists that any consent was invalid, given that he was handcuffed before the searches

occurred.  "An individual may validly consent to an otherwise impermissible search if, in the totality of circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *United States v. Rambo*, 789 F.2d 1289, 1296 (1986) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 at 226–27); *United States v. Dennis*, 625 F.2d 782, 793 (8th Cir. 1980).  The government bears the burden of proving consent was voluntary by a preponderance of the evidence.  *Saenz*, 474 F.3d 1132 at 1137.  "Although the fact of custody, alone, does not render consent involuntary, the government bears a heavy burden of proving that consent granted by an individual under arrest was not the product of coercion." *United States v. Slupe*, 692 F.2d 1183, 1188 (8th Cir. 1982).  Whether consent was voluntarily given is a question of fact.  *United States v. Kampbell*, 574 F.2d 962, 963 (8th Cir. 1978).

The test to determine whether a reasonable officer would believe a defendant's consent was voluntary includes: "(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals." *United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (quoting *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011)).  Additionally, the court may look to the overall atmosphere in which consent was given, including: length of detention; the use of threats, intimidation, or punishment by police; the use of promises or misrepresentations by police; whether the individual was in custody or under arrest at the time of consent; whether the individual was in a public or secluded place when consent was given; and whether the individual stood by silently or objected to the search. *Id*.  Whether a suspect has been given *Miranda* warnings is considered, but is not required, in determining valid consent, and "an absence of Miranda warnings would [not] make an otherwise

14

voluntary consent involuntary." *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012) (quoting *United States v. Saenz*, 474 F.3d 1132, 1137 (8th Cir. 2007)). The police are not required to inform a person giving consent that he has the right to withhold it. *Schneckloth v, Bustamonte*, 412 U.S. 218, 249 (1973).

The government's "burden is not satisfied by showing a mere submission to a claim of lawful authority. Rather, the government must show a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unrestrained choice." *United States v. Cedano–Medina*, 366 F.3d 682, 684 (8th Cir. 2004) (internal citations and quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The question is not whether a defendant subjectively consented, "but rather, whether a reasonable officer would believe consent was given." *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011).

Considering *Dunning*, *supra*, there is no evidence that defendant lacked the maturity or mental ability to consent. He invited Officer Cooper to look in the satchel. He did not appear to be under the influence of alcohol or other substances. He did have prior experience with the police and the criminal justice system, and so he was familiar with the rights afforded suspects. He did not withdraw his consent. Additionally, there is no evidence that Officers Cooper and Tyson misrepresented their purpose for the traffic stop or used some other impermissible tactic to influence defendant or bend his will. Kossuth Street was relatively quiet at 12:15 a.m., but there is no evidence that this location was chosen by Officer Cooper for its seclusion. People walked

by.  The traffic stop occurred near a street light after defendant turned onto Kossuth Street in compliance with the police vehicle's signal of flashing lights.

However, there are two factors under *Dunning* that nevertheless make this a somewhat close case.  *Id.*  First, defendant was handcuffed and, second, once he was handcuffed there were no *Miranda* warnings given prior to obtaining consent.  *See, e.g., United States v. Lomas*, 223 F. Supp. 3d 874, 880 (S.D. Iowa April 14, 2015) (noting suspect's handcuffing by officer followed by reading of *Miranda* warning and discussion of her rights prior to her granting consent to search shared hotel room supported conclusion that consent was voluntary).  Here, defendant argues that this environment was unduly coercive and it was unreasonable for Officer Cooper to thereafter rely on his verbal consent as voluntary.  With due consideration to all the facts in this case, this argument is unavailing.  Defendant was cooperative with Officer Cooper.  He was not questioned for a prolonged period or in a persistent manner.  He seemed to understand the nature of the request to search and he answered questions that appeared appropriate and consistent with his overall demeanor and age.  No promises or threats were made to him.  He agreed readily to a search of his satchel before agreeing to the search of the vehicle.  Finally, it does not appear on these facts that Officer Cooper handcuffed defendant to unduly influence or deceive him.  *See United States v. Carr*, 895 F.3d 1083 (8th Cir. 2018)*; Beasley*, 688 F.3d 523 at 531 (rejecting defendant's argument that his consent to search was not voluntary when it was obtained in custody but where there was no evidence of coercion).  *See also United States v. Vinton*, 631 F.3d 476, 482 (8th Cir. 2011) (ruling that the ultimate question in determining voluntariness of consent is whether the defendant's will was overborne and his capacity for self-determination was critically impaired).  In this case, defendant decided his degree of cooperation, evidenced by his demeanor and responses.  All of this suggests that the government has satisfied its burden by

a preponderance that Officer Cooper could rely upon defendant Perkins' personal characteristics and verbal responses as signs of his agreement to consent.  This point should be denied.

### E. Defendant's Arrest Was Lawful.

The Eighth Circuit has ruled that whether officers make a formal arrest or a detention ripens into an arrest, "[a] warrantless arrest is consistent with the Fourth Amendment if it is supported by probable cause."  *Guevara*, 731 F.3d at 832; quoting *Ulrich v. Pope Cnty.*, 715 F.3d 1054, 1059 (8th Cir. 2013) (quoting *Borgman v. Kedley*, 646 F.3d 518, 522–23 (8th Cir. 2011)); *see also Martinez*, 462 F.3d at 907, 910 (holding in the alternative that even if handcuffing a suspect did convert the detention into an arrest, the arrest was justified by probable cause).  "Probable cause to make a warrantless arrest exists 'when the totality of the circumstances at the time of the arrest are sufficient to lead a reasonable person to believe that the defendant has committed or is committing an offense.'"  *Ulrich*, 715 F.3d at 1059 (quoting *Borgman*, 646 F.3d at 523).

Officer Cooper had probable cause to arrest defendant based on the totality of the circumstances because defendant was not authorized under state law to possess ammunition or weapons.  Therefore, his arrest was valid.

### F. The Automobile Exception Applies.

Upon defendant's arrest, Officer Cooper alternatively had probable cause to search the vehicle under the automobile exception to the warrant requirement.  In such circumstances, an officer with probable cause to search a vehicle may search any item within that vehicle that is capable of containing the object of the search, regardless of whether the item belongs to the driver, passenger, or someone else.  *Wyoming v. Houghton*, 526 U.S. 295, 307 (1999).  "If probable cause justifies the search of lawfully stopped vehicle, it justifies the search of every part

of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). *See also United States v. Brown*, 634 F.3d 435 (8th Cir. 2010).

The Eighth Circuit has noted that the "automobile exception" permits the warrantless search of a vehicle if the police "had probable cause to believe the vehicle contained contraband or other evidence of a crime before the search began." *United States v. Wells*, 347 F.3d 280, 287 (8th Cir. 2003). If the automobile exception applies, the vehicle need not be searched immediately. *United States v. Castaneda*, 438 F.3d 891, 894 (8th Cir. 2006). "Probable cause sufficient to justify a search exists where, in the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kennedy*, 427 F.3d 1136, 1141 (8th Cir. 2005). In making the probable-cause determination, we "apply a common sense approach and consider all relevant circumstances." *Id.* Accordingly, officers did not need a warrant to search the Saturn Ion.

### G. Plain View

Once inside the Saturn, the plain view doctrine provides that "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Gillon*, 348 F.3d 755 (8th Cir. 2003). Evidence discovered in plain view during the course of a valid protective sweep is admissible at trial. *United States v. Boyd*, 180 F.3d 967, 976 (8th Cir. 1999) (upholding as valid the marshals' sweep of a bedroom upon defendant's arrest and seizure of a firearm partially exposed in a black bag in the closet of that room). As such, the seizure of firearms was valid on this basis as well.

## II.    SUPRESSION OF STATEMENTS

When a defendant is both in custody and interrogated, he must be advised of his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).  "Officers must provide *Miranda* warnings to suspects in custody because 'the inherently coercive nature of custodial interrogation blurs the line between voluntary and involuntary statements.'"  *United States v. Diaz*, 736 F.3d 1143, 1148 (8th Cir. 2013) (quoting *J.D.B. v. North Carolina*, 564 U.S. 261, 269 (2011) (internal quotation marks omitted)).  See *United States v. Crisolis–Gonzalez*, 742 F.3d 830, 836 (8th Cir. 2014) ("Interrogation in the *Miranda* context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." (quotation omitted)).

An officer who temporarily stops a motorist during a traffic stop is not required to give *Miranda* warnings prior to asking limited questions when the motorist is "not subjected to restrains comparable to those of a formal arrest."  *United States v. Coleman*, 700 F.3d 329, 336 (8th Cir. 2012) (noting factors including that during conversational questioning by state trooper while defendant sat in front seat of patrol car un-handcuffed that he was told he was temporarily detained).  Unlike in *Coleman*, defendant Perkins was not free to leave once he was detained and handcuffed and not told that his detention was temporary.  *Id.*  His functional arrest triggered the first prong of *Miranda*.

The second matter is whether Officer Cooper questioned defendant to elicit an incriminating response after he was in custody.  This is a close matter.  So long as Officer Cooper questioned defendant about the possible presence of ammunition or firearms for safety purposes, defendant's responses should not be suppressed.  The public safety exception "does not apply to 'questions designed solely to elicit testimonial evidence from a suspect.'"  *New York*

19

*v. Quarles*, 467 U.S. 649, 659 (1984).  "In this context, ... protection of the public safety includes protection of the police officers themselves.  The exception does not depend upon the subjective motivation of the questioning officers."  *United States v. Liddell*, 517 F.3d 1007, 1009 (8th Cir. 2008) (citation omitted).  The Eighth Circuit has "recognized that the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient basis to ask a suspect who has been *arrested* and *secured* whether there are weapons or contraband in a car or apartment that the police are about to search." *Id.* at 1009–10 (emphasis added).  In *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999), the Eighth Circuit applied the public-safety exception to defendant's disclosure of a firearm in response to an officer asking him whether there was "anything we need to be aware of" in the apartment.  *Id.*  The officer was aware that Williams had a history of weapons possession and the Eighth Circuit reasoned that "the officers could not have known whether other hazardous weapons were present in the apartment that could cause them harm if they happened upon them unexpectedly or mishandled them in some way." *Id.* at 954 (footnote omitted).

Here, Officer Cooper testified that he was concerned for his safety, and he had good reason for concern given defendant's unusual and illogical response about possessing bullets as a self- reminder that he could not possess guns.  There is a logical link between a person's possession of a firearm with ammunition.  However, the undersigned is not convinced that the public-safety exception outlined in *Quarles* applies to defendant's answers about why he had bullets and why he could not have a firearm—because he was a felon on parole for dope.  It was reasonably likely such questions by a police officer would elicit incriminating responses.  The testimony is in sum,

> Officer Cooper:        Why do you have two bullets in your bag?

| Defendant Perkins: | I keep them in there to remind me that I am not allowed to have guns. |
| Officer Cooper: | Are you a felon? |
| Defendant Perkins: | Yes, I'm on parole for dope. |

These *why* questions posed to defendant are different from instances approved by the Eighth Circuit where an officer asks a suspect during a *Terry* stop to confirm whether he or she possesses a weapon, drugs or other items that might cause harm.  *See United States v. Liddell*, 517 F.3d 1007, 1009-10 (8th Cir. 2008) (citation omitted) (recognizing that "the risk of police officers being injured by the mishandling of unknown firearms or drug paraphernalia provides a sufficient basis to ask a suspect who has been arrested and secured whether there are weapons or contraband in a car or apartment that the police are about to search.")  In *United States v. Williams*, 181 F.3d 945, 953 (8th Cir. 1999), the Eighth Circuit applied the public-safety exception to the defendant's disclosure without *Miranda* warnings given of a firearm in response to an officer asking him whether there was "anything we need to be aware of" in the apartment. *Id.*  Here, the officer's *why* questions cannot be clearly said to be reasonably prompted by a concern for public safety such that the public safety exception should apply.  That said, there is no evidence that these two questions were asked by Officer Cooper as part of a ruse to extract an unsworn statement from defendant.  Given the context, the questions were highly relevant but defendant's answers should be suppressed because defendant was handcuffed and, therefore, he was not free to leave and his responses tended to incriminate him.  Therefore, defendant's

responses about why he possessed bullets and confirmation of his parole status should be suppressed.[7]

There is an additional matter in this inquiry that must also be addressed.  The question of whether defendant's will was overborne or if his statements lacked the requisite voluntariness does not depend on *Miranda* warnings being given.  "The requirement that Miranda warnings be given does not, of course, dispense with the voluntariness inquiry."  *Dickerson v. United States*, 530 U.S. 428, 444 (2000).  "A statement is involuntary when it was extracted by threats, violence, or express or implied promises sufficient to overbear the defendant's will and critically impair his capacity for self-determination."  *United States v. Vega*, 676 F.3d 708, 718 (8th Cir. 2012) (citation and internal quotation marks omitted).  The court "consider[s], among other things, the degree of police coercion, the length of the interrogation, its location, its continuity, and the defendant's maturity, education, physical condition, and mental condition."  *Id.* (alteration in original) (citation and internal quotation marks omitted).  The court must look to the totality of the circumstances surrounding the interrogation to determine whether the waiver was the product of a free and deliberate choice, rather than intimidation, coercion, or deception; and whether the waiver was made with an awareness of the right being abandoned and the consequences of the decision to abandon it.  *Moran v. Burbine*, 475 U.S. 412 (1986).  *United States v. Castro–Higuero*, 473 F.3d 880, 886 (8th Cir. 2007) (internal quotation omitted).

Relevant to this inquiry is whether an accused has knowingly and voluntarily waived *Miranda* rights – an inquiry which depends upon the facts of each particular case, including the defendant's background, experience, and conduct.  *United States v. Boyd*, 180 F.3d 967, 977 (8th

---

[7] However, this finding has no impact on the legality of defendant's arrest as discussed above because Officer Cooper independently confirmed defendant's criminal history through the REGIS system in his patrol vehicle.

Cir. 1999). "The government has the burden of proving that the defendant 'voluntarily and knowingly' waived his rights." *Id.* This burden is a heavy one. *Lamp v. Farrier*, 763 F.2d 994, 996 (8th Cir. 1985) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). "The courts must presume that a defendant did not waive his rights; the prosecution's burden is great; but in at least some cases waiver can be clearly inferred from the actions of the person interrogated." *Butler*, 441 U.S. at 373. The appropriate test for determining the voluntariness of a confession is "whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. McClinton*, 982 F.2d 278, 282 (8th Cir. 1992) (quoting *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989)). In analyzing the "overborne will" test, the court looks at the conduct of the officers and the capacity of the suspect to resist pressure to confess. *Id.* (citing *Colorado v. Connelly*, 479 U.S. 157 (1986)). The statement must be voluntary and not the product of any police conduct by which the defendant's will is overborne. *Haynes v. Washington*, 373 U.S. 503 (1963); *Colorado v. Connelly*, 479 U.S. at 170. However, as the Supreme Court stated in *Berkemer v. McCarthy*, 468 U.S. 420 (1984), "[c]ases in which a defendant can make a colorable argument that a self-incriminating statement was 'compelled' despite the fact that law enforcement authorities adhered to the dictates of Miranda are rare." *Id.* at 433 n.20; *Dickerson*, 530 U.S. at 444. There is no evidence of coercion in this case. Being confronted with evidence of a crime is not patently coercive and there is no evidence that any promises were made to him.

The record here does not suggest that Officer Cooper conducted a formal interview of defendant after his arrest. To the extent that defendant made a spontaneous statement about who might have possessed or left the firearms in the Saturn, any such statement should be admissible

because it was not made in response to an officer's question.  *See United States v. Jones*, 842 F.3d 1077, 1083 (8th Cir. 2016)(citing *United States v. Chips*, 410 F.3d 438, 445 (8th Cir. 2005).

## III. PRO SE MOTIONS

Finally, to the extent that defendant *pro se* seeks to supplement his motion to suppress evidence and statements filed by his lawyer with an amended motion to suppress and statements (Doc. #61) and a motion to dismiss (Doc. #70), his motions are denied.  Defendant should file any motions through his counsel.  "There is no constitutional or statutory right to simultaneously proceed pro se and with benefit of counsel."  *United States v. Agofsky*, 20 F.3d 866, 872 (8th Cir. 1994).  "A district court has no obligation to entertain pro se motions filed by a represented party."  *Abdullah v. United States*, 240 F.3d 683, 686 (8th Cir. 2001); *see also Agofsky*, 20 F.3d at 872 (noting that a court commits "no error" in refusing to rule on pro se motions filed by represented party); *United States v. Frook*, No. 4:05-CR-677 CAS, 2008 WL 5110596, at *4 (E.D. Mo. Dec. 3, 2008) (denying *pro se* motion filed by represented defendant); *United States v. Turner*, No. 4:09CR0032 RWS/TCM, 2009 WL 2175976, at *1 (E.D. Mo. July 21, 2009) (holding the same).  Nevertheless, the undersigned has reviewed defendant's Motions.  He raises no new arguments in his *pro se* Motion to Suppress Evidence and Statements.  Defendant's Motion to Dismiss cites to several Federal Rules of Criminal Procedure and other law.  His Memorandum in Support sets forth a timeline, which does not appear to clearly state a claim.  For the foregoing reasons and based on the record made, the *pro se* Motions are denied without prejudice.

Accordingly,

**IT IS HEREBY RECOMMENDED** that Defendant Harold Perkins' Motion to Suppress Evidence and Statements (Doc. No. 32) be **GRANTED** in part as to any statement made regarding his parole status and should be **DENIED** in all other respects.

**IT IS HEREBY ORDERED** that Defendant Harold Perkins' *Pro Se* Amend Motion to Suppress Evidence and Statements (Doc. No. 61); and *Pro Se* Motion to Dismiss for Violation of Constitution Right of Due Process of Law (Doc. No. 70) are **DENIED**.

**IT IS FURTHER ORDERED** that this cause is set for trial before United States District Judge Stephen N. Limbaugh, Jr., on March 6, 2019 at 11:10AM in Courtroom 3N, St. Louis Division.

The parties are advised that they have fourteen (14) days to file written objections to this report and recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to timely file objections may result in the waiver of the right to appeal questions of fact.  *Thompson v. Nix*, 897 F.2d 356, 357 (8th Cir. 1990).

/s/Noelle C. Collins
United States Magistrate Judge

Dated this 16th day of January, 2019.